UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JASON CAMPBELL,

        Plaintiff,

v.                                          Case No. 04-C-807

BROWN COUNTY,
JEFFREY JORGENSEN, et al.,

        Defendants.

**DECISION AND ORDER**

Plaintiff Jason Campbell brings this § 1983 action to remedy what he believes were violations of his constitutional rights to be protected from cruel and unusual punishment. In particular, he alleges that while he was a pretrial detainee at the Brown County Jail, the defendants neglected to provide treatment for his serious mental health problems. As a result, Campbell caused serious harm to himself when he intentionally caused serious damage to his eyes.[1] The defendants have filed a motion for summary judgment and, for the reasons given below, the motion is denied in part and granted in part.

**I. Background**

On April 4, 2001, Jason Campbell was booked into the Brown County Jail on a charge of

---

[1]Since the defendants' motion for summary judgment was filed, the plaintiff has moved to amend the complaint to add additional defendants. That motion was granted. The only defendants at issue in the present motion are Jeffrey Jorgensen, Brown County, and the Brown County Sheriff's Department. In addition, the plaintiff has stipulated that punitive damages are not available against the County.

robbery. Over the next several months, Campbell was transferred to jails in Shawano and Waushara Counties because of overcrowding in Brown County's jail. While incarcerated in the Waushara County Jail, Campbell reported being sexually assaulted while alone in his cell with the door closed, completely clothed and under a blanket. He claimed knowledge of the assault based on instinct and the discomfort in his stomach. He was returned to Brown County the following day, but transferred to the Shawano County Jail on May 20, 2001.

Brown County opened its new jail on June 23, 2001, and Campbell was moved there on the following day. Initially placed in Bravo Pod, Campbell requested to be moved to a cell by himself on June 27, 2001, because it would make him feel safer and more at ease. Although Campbell was compliant with jail rules and regulations at first, officers began noting minor violations shortly after his transfer. On July 2, 2001, he was given a verbal warning for taking off his wristband. For safety and security reasons, inmates are required to wear a wristband at all times. He was given another warning for not wearing his wristband on July 4, and issued a citation for the same infraction on July 7, 2001. On July 20, 2001, Campbell kicked and cracked the lower window in his cell door. When asked about the incident, Campbell reported feeling depressed. He was transferred to a rubber room used for suicidal inmates and was forced to wear a suicide smock. He stated that he kicked the window because he believed the entire pod in which he was housed would "shoot up in the air." (PPFOF ¶ 96.) On July 20, a crisis worker visited Jason and concluded that Jason should be seen by a psychiatrist and should be placed in a cell visible by officers at all times. These recommendations were not followed, however.

The next day, Officer Jeffrey Jorgensen noticed that Campbell was on the floor of his cell and that one of his eyes was red. After a brief back-and-forth, Jorgensen realized that Campbell had

2

injured his eye. Jorgensen called for backup and Campbell was taken to the hospital to receive emergency medical care. (Jorgensen Aff., Ex. EE.) Campbell explained that he had poked at his eye because he had already poked out the eye of an alien who was in his room. Three days later, Campbell (back in his cell) asked Jorgensen for help using eye drops that had been prescribed. Jorgensen testified that he began informally conversing with Campbell, and attempted to dissuade him from further self-infliction of harm. He asked him, for example, "why are you messing with your eyes?" "You only have one set of eyes," he continued, and noted that Campbell would not be able to see his daughter or wife if he continued to harm his eyes. (PPFOF ¶ 64.) On July 29, Campbell gouged out both of his eyes with his finger, apparently under the belief that a woman's voice told him to do so.

**II. Analysis**

**1. Defendant Jorgensen**

Campbell's claim is that Jorgensen was deliberately indifferent to Campbell's serious medical needs, a violation of the Eighth Amendment's ban on cruel and unusual punishment. Deliberate indifference, as the phrase suggests, means a defendant was aware of a health or safety risk and disregarded it nevertheless. *Mathis v. Fairman,* 120 F.3d 88, 91 (7th Cir. 1998). Campbell claims that Jorgensen obviously knew Campbell was a threat to himself given the incident on July 21, which required a trip to the hospital. He had also spoken with Campbell about the issue, even attempting to talk him out of continuing to damage his eyes. In Campbell's view, Jorgensen should have aided in obtaining medical and psychiatric care to prevent further injury. He also should have placed Campbell on constant observation. His failures to do so, the plaintiff argues, establish that he was deliberately indifferent to Campbell's medical needs.

3

When an inmate causes harm to himself, it is of course difficult to demonstrate that other people were responsible for that harm. One must show that the risk of harm was known and that the officer disregarded it. Thus, as a factual matter, it is much easier to demonstrate that an officer was deliberately indifferent to an inmate who was screaming out for help than it is to show the officer knew the prisoner would inflict harm on himself in secrecy. Because lawsuits arise only after the fact, particular care must be taken to avoid the assumption that because the harm occurred the risk of that harm was obvious. Moreover, what passes for unusual behavior in the outside world does not necessarily seem unusual in the prison or jail context. If a guard's failure to pay particular heed to every unusual or aggressive act committed by an inmate could be grounds for deliberate indifference, liability under § 1983 would be nearly endless.

That said, in some instances a prisoner's self-infliction of harm can give rise to § 1983 liability. But, perhaps in recognition of the difficulty in predicting an inmate's self-inflicted wounds, *see Jutzi-Johnson v. United States,* 263 F.3d 753, 755 (7th Cir. 2001), the "deliberate" indifference standard in cases of self-inflicted harm is met only if there were a "strong likelihood, rather than a mere possibility," that harm would occur. *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 261 (7th Cir. 1996); *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir. 1983).

Jorgensen argues that Campbell's risk of causing himself injury was either not substantial or speculative. In particular, he rejects the plaintiff's attempts to impute others' knowledge about Campbell's possible self-destructive tendencies to him; he also states that he was unaware of any of Campbell's episodes of delusions or hallucinations. The plaintiff believes, however, that it is at least a jury question of whether Jorgensen was deliberately indifferent to Campbell's risk of harming himself because Jorgensen ignored the strong likelihood that Campbell would continue

4

gouging his eyes.

While defendants' motion is not without merit–Jorgensen, after all, tried to counsel the plaintiff against continued self-destructive behavior–I conclude that a jury could reasonably conclude that Jorgensen's failure to do anything more than engage in an *ad hoc* chat with Campbell constituted deliberate indifference to a known risk of self-inflicted harm. There is certainly enough in the record to support the notion that Jorgensen knew Campbell was self-destructive and/or mentally ill, and that more aggressive measures were warranted. In the face of evidence that Campbell was psychotic and delusional at the time, a jury is not bound by Jorgensen's claim that he was unaware that Campbell was not in control of his faculties. Moreover, as the Seventh Circuit found in another case:

> Johnson [the guard] did not have to know the specifics of the danger to be culpable. Indeed, accepting Johnson's position would essentially reward guards who put their heads in the sand by making them immune from suit-the less a guard knows the better. That view is inconsistent with *Farmer*. What matters is that Johnson was aware of a serious risk of harm in some form, be it assault or the more serious transgression that actually occurred. And just because Velez did not volunteer detailed information does not mean that Johnson was not made aware of a serious risk. Indeed, a jury could well find that the vague nature of Velez's complaint made it even more incumbent on Johnson to investigate further.

*Velez v. Johnson,* 395 F.3d 732, 736 (7th Cir. 2005). Here, based on his first-hand knowledge that Campbell had previously damaged his eye and facts from which a reasonable jury could infer that Campbell's mental illness was apparent, I cannot conclude that Jorgensen is entitled to summary judgment.

For the same reasons, I conclude that qualified immunity does not apply. If Jorgensen knew about a substantial risk that Campbell would harm himself, then his failure to take any action to prevent him from doing so could have constituted deliberate indifference, which is a clearly

5

established principle in constitutional adjudication. *Haley v. Gross,* 86 F.3d 630, 646 (7th Cir. 1996). Accordingly, because the contours of the right to be free from deliberate indifference were well established, Jorgensen cannot be afforded immunity for his failure to act. Accordingly, the motion for summary judgment will be denied as to defendant Jorgensen.

**2. Municipal Liability**

The plaintiff also brings a § 1983 claim against the County.[2] He does not challenge Brown County's policies themselves as being unconstitutional, but instead claims that the jail administrator adopted a practice of failing to ensure that the County's policies were followed. A municipality may not become liable for the constitutional torts of its employees under a *respondeat superior* theory, but instead only when the employees' acts were themselves an extension of official policy. Thus, government entity is responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 694 (1978). When the claim is based on the informal policy of a governmental entity, as here, it must implicate "a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy." *Lawrence v. Kenosha County,* 391 F.3d 837, 844 (7th Cir. 2004)(citing *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 735 (7th Cir.1994)).

Campbell has not identified any policy–informal or otherwise–that was either common or widespread. Instead, the entirety of his case relates only to his *own* treatment. There is little in the

---

[2]Campbell also sued the Brown County Sheriff's Department. Because the Sheriff's Department is merely a sub-unit or agency of the County, *West v. Waymire*, 114 F.3d 646 (7th Cir. 1997), all claims against it will be dismissed.

record suggesting how the jail always, or usually, treats its mentally ill inmates. The claim is limited to a belief that the jail should have listened to the recommendations of the crisis worker and obtained psychiatric care for Jason. No doubt that is true, but even so it does not establish a widespread practice or even a practice at all. It merely establishes a breakdown in a single case, and such an event cannot be attributable to the county at-large: as the Seventh Circuit has observed elsewhere, the "'bad acts' from which municipal liability may be indirectly inferred must be a 'pattern of conduct or a series of acts violative of constitutional rights.'" *Estate of Novack ex rel. Turbin v. County of Wood,* 226 F.3d 525, 532 (7th Cir. 2000)(quoting *Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir.1981)). In *Novack,* a jail suicide case, the court found no governmental liability because

> [t]he plaintiffs have not presented any evidence that WCJ personnel regularly ignored established WCJ policies, rather than simply failing to follow certain policies in the singular instance of their treatment of Novack . . . . Because the plaintiffs have not presented evidence of a "series" of constitutional violations, or of any constitutional violations at all, there is no "bad acts" evidence from which County liability may be inferred under Monell.

The same holds true here. Without any evidence establishing a particular course of conduct, the plaintiff cannot recover against the county itself under § 1983.

**3. State Claims**

The complaint also asserts state law negligence claims against the defendants based on the same set of operative facts. Defendants claim they are entitled to summary judgment because they are immune from liability for state law claims under Wisconsin law. Wis. Stat. § 893.80(4) provides:

> No suit may be brought against any ... political corporation, governmental subdivision, or any agency thereof ... or against its officers, officials, agents, or

7

employees for acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions.

In construing this section, the Wisconsin Supreme Court has held that the terms "quasi-judicial" and "quasi-legislative" are synonymous with "discretionary." *Scarpaci v. Milwaukee County*, 292 N.W.2d 816, 826 (Wis. 1980). Thus, municipal employees are immune from liability for their discretionary acts, but can be held liable for acts that are characterized as ministerial. *Id.* at 827. "The test for determining whether a duty is discretionary (and therefore within the scope of immunity) or ministerial (and not so protected) is that the latter is found only when the duty is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Kimps v. Hill*, 546 N.W.2d 151, 156 (Wis.1996) (internal quotations and brackets omitted). Additionally, a municipal employee is not entitled to immunity from liability for conduct that is malicious, willful and intentional. *Ibrahim v. Samore*, 348 N.W.2d 554, 558 (Wis. 1984), or when he or she is aware of a danger that is of "such quality that the public officer's duty to act becomes 'absolute, certain and imperative.'" *Barillari v. City of Milwaukee*, 533 N.W.2d 759, 763 (Wis.1995). Defendants claim that the decision of how to respond to Campbell's behavior required the exercise of discretion on the part of Jorgensen and the other jail personnel, and thus constitutes the kind of quasi-legislative or quasi-judicial determination for which immunity is afforded.

Here, too, however, I conclude that the evidence is sufficient to permit a jury to determine the defendants' liability. As above, I conclude that a reasonable jury could conclude that, given Campbell's apparent mental illness and his previous attempt to injure his own eye, Jorgensen and

any other correctional officer aware of these facts should have recognized the danger that he would more seriously injure himself if not effectively treated for his mental illness or restrained. In light of the magnitude of the danger, I cannot conclude from the record as it now stands that officers who failed to take action under these circumstances are immune from liability under § 893.80(4). And since the County's employees may be liable, the County may be also. *See Figgs v. City of Milwaukee*, 357 N.W.2d 548, 551 (Wis. 1984) (holding "cities and other governmental units can be held liable in damages for the negligence of their employees under the doctrine of respondeat superior"). Accordingly, the defendants' motion will be denied as to Campbell's state law claims.

**III. Conclusion**

In sum, all claims against the Brown County Sheriff's Department are dismissed. Plaintiff's § 1983 claim against defendant Jorgensen remains, as does his state law claims against both Jorgensen and the County. And of course, the claims against the additional defendants named in plaintiff's amended complaint are not addressed herein. The motion for summary judgment is therefore DENIED in part and GRANTED in part.

SO ORDERED.

Dated this 2nd day of May, 2006.

                                                    /s William C. Griesbach
                                                    William C. Griesbach
                                                    United States District Judge